E-FILED 11.14.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PHILEMON TAM, KATHY T-M TAM,
TITUS TAMBUNAN, CHRISTINE
TAM, and VICTOR TAM,

          Plaintiff,

        vs.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its own name and as
Receiver for IndyMac Bank, F.S.B.;
DOES 1 through 10,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 08-06458 MMM (AJWx)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A). That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it. The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter. Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

The parties filed opening briefs on September 14, 2009;[1] the FDIC filed a responsive brief on September 28, 2009.[2]  On July 31, 2009, the court granted plaintiffs' request for oral argument and set a hearing for October 19, 2009.

## I.  FINDINGS OF FACT

### A.    The Accounts

1.    Plaintiffs Philemon Tam, Kathy T-M Tam, Titus Tambunan, Christine Tam, and Victor Tam opened nine accounts with IndyMac prior to July 11, 2008.[3]

2.    Prior to July 11, 2008, account XXXXXX7443 had a balance of $8.243.43 and was held in the name of Kathy T-M Tam.  Account XXXXXX1808 had a balance of $14,088.64 and was also held in the name of Kathy T-M Tam.  Account XXXXXX7442 had a balance of $18,313.30 and in the name Philemon Tam. Account XXXXXX8867 had a balance of $4,039.54 and was held in the name of Victor C. Tam, while account XXXXXX7347 had a balance of $561,762.46 and was held by Kathy T-M Tam in trust for ("ITF") Christine Tam, Philemon Tam, Victor Tam, and Daphne Malatesta.  Account XXXXXX0218 had a balance of $742,638.17 and was held by Philemon Tam and Kathy T-M Tam ITF

---

[1]Plaintiffs Philemon Tam, Kathy T-M Tam, Titus Tambunan, Christine Tam, and Victor Tam's Opening Brief; Request for Oral Argument ("Tams' Brief"), Docket No. 54 (Sept. 14, 2009); Defendant Federal Deposit Insurance Corporation's Opening Trial Brief re: Review of Insurance Determination ("FDIC's Brief"), Docket No. 56, (Sept. 14, 2009).  Plaintiffs did not seek to augment the administrative record, and this is therefore the record to which the court looks in deciding the action.

On September 23, 2009, the FDIC filed a supplemental brief advising that, upon further administrative review of a portion of its insurance determination related to plaintiffs' accounts, it had concluded that plaintiffs were entitled to an additional $100,000 in insurance.  (Defendant Federal Deposit Insurance Corporation's Supplement to the Opening Trial Brief Regarding Review of Insurance Determination ("FDIC's Supp. Brief"), Docket No. 58, (Sept. 23, 2009)

[2]Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 60 (Sept. 28, 2009).

[3]Declaration of Michael Norton Attaching Administrative Record ("Norton Decl."), Docket No. 55 (Sept. 14, 2009), ¶ 3; Exh. A (Administrative Record ("AR")) at 2.

Christine Tam, Victor Tam, and Daphne Malatesta.  Account XXXXXX1399 had a balance of $10,063.23 and was held by Titus Tambunan ITF Christine and Victor Tam. Account XXXXXX8317 had a balance of $202,468.12 and was held by Titus Tambunan ITF Christine and Victor Tam, while account XXXXXX2173 had a balance of $540,729.07 and was held by Titus Tambunan ITF Christine and Victor Tam.[4]  The funds deposited in the nine accounts belonging to plaintiffs totaled $2,102,345.96.[5]

3.      Accounts XXXXXX7347, XXXXXX0218, XXXXXX1399, XXXXXX8317, and XXXXXX2173 were informal revocable trust accounts.[6]  Accounts XXXXXX7443, XXXXXX1808, XXXXXX7442, and XXXXXX7442 were single ownership accounts.[7]

4.      Account XXXXXX7347 was held by Kathy T-M Tam.  The beneficiaries for this account were Philemon Tam, her husband, Christine and Victor Tam, her children, and Daphne Malatesta, her granddaughter.  Account XXXXXX0218 was held by Philemon Tam and Kathy T-M Tam.  The beneficiaries for this account were Christine and Victor Tam, the depositors' children, and Daphne Malatesta, their granddaughter.  Accounts XXXXXX1399, XXXXXX8317, and XXXXXX2173 were held by Titus Tambunan.  The beneficiaries for these accounts were Christine and Victor Tam, his niece and nephew respectively.[8]

---

[4]Norton Decl., ¶ 3; AR, Exh. A at 2.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Norton Decl., ¶ 3 n. 1.)

[5]Norton Decl., ¶ 3; AR, Exh. A at 2.

[6]Norton Decl., ¶ 5.  The Tams' trial brief challenges the FDIC's use of a regulation to determine the amount of insurance coverage on their revocable trust accounts that was in effect on the date IndyMac Bank failed, as opposed to an interim rule adopted on September 30, 2008. Plaintiffs do not challenge the FDIC's factual conclusions or calculation of insurance available under the regulation in effect on July 11, 2008.

[7]*Id.*, ¶ 4.

[8]Norton Decl., ¶¶ 5-6.

3

**B.      The FDIC's Insurance Determination**

5.      The FDIC as receiver for IndyMac assigned Michael Norton to review deposit insurance coverage and claims arising out of IndyMac's failure.  Norton reviewed the nine accounts at issue in this case.[9]

6.      On July 12, 2008, Norton interviewed Philemon Tam and explained his preliminary determination regarding the amount of insured and uninsured funds in the accounts.  Tam indicated that he would fill out and fax to Norton "Declarations of Testamentary Deposit" for each informal trust account.  Tam requested that Norton provide a preliminary determination of insurance coverage, and Norton informed him that approximately $1,250,000.00 of the funds appeared to be uninsured.[10]  The declarations that Tam subsequently provided  listed owners and beneficiaries for each of the revocable trust accounts that were not reflected in IndyMac's records at the time it closed on July 11, 2008.[11]  As a result, the FDIC relied on the bank's records in making its deposit insurance determination.[12]

7.      Norton concluded that accounts XXXXXX7443, XXXXXX1808, XXXXXX7442, and XXXXXX7442 were single ownership accounts.  Single ownership accounts owned by Kathy T-M Tam (XXXXXX7443 and XXXXXX1808) had a balance of $22,332.07.  The single ownership account owned by Philemon Tam (XXXXXX7442) had a balance of $18,313.30.  The single ownership account owned by Victor Tam (XXXXXX8867) had a balance of $4,039.54.  Each of these single ownership accounts was fully insured, as each had a balance less than $100,000.[13]

---

[9]Norton Decl., ¶ 2.

[10]AR, Exh. B ("Depositor Interview Form").

[11]Norton Decl., ¶ 8; AR Exh. C.

[12]Norton Decl., ¶ 8.

[13]*Id.*, ¶ 4.

8.      Norton concluded that account XXXXXX7347 was held by Kathy T-M Tam.  Norton concluded that XXXXXX0218 was held by Philemon and Kathy T-M Tam.  The beneficiaries for both accounts were Christine and Victor Tam, the depositors' children, and Daphne Malatesta, their granddaughter.  In addition, Philemon Tam was a beneficiary on account XXXXXX7347.  Norton concluded that under the deposit insurance rules then in effect, the two accounts had seven "beneficial relationships," defined as a relationship between one trustee and one beneficiary.[14]  He found that all seven beneficial relationships involved qualifying beneficiaries (spouse, children, and grandchild).[15]

9.      Norton determined that because account XXXXXX7347 had four beneficial relationships, each beneficial relationship was entitled to a one-quarter share of $140,440.62.[16]  Because account XXXXXX0218 had six beneficial relationships, he found that each beneficial relationship was entitled to a one-sixth share equal to $123,773.03.[17]  Three beneficial relationships – Kathy T-M Tam ITF Christine Tam, Kathy T-M Tam ITF Victor Tam, and Kathy T-M Tam ITF Daphne Malatesta – had an interest in both accounts; consequently, Norton aggregated the shares for a total of $264,213.64.[18]

10.     Norton concluded that Philemon Tam ITF Christine Tam; Philemon Tam ITF Victor Tam; and Philemon Tam ITF Daphne Malatesta each held $123,773.03 in the two accounts.  He concluded that Kathy T-M Tam ITF Christine Tam, Kathy T-M Tam ITF Victor Tam, and Kathy T-M Tam ITF Daphne Malatesta each held $264,213.64 in the two accounts.

---

[14]The relationships were: Philemon Tam ITF Christine Tam; Philemon Tam ITD Victor Tam; Philemon Tam ITF Daphne Malatesta; Kathy T-M Tam ITF Christine Tam; Kathy T-M Tam ITF Victor Tam; Kathy T-M Tam ITF Daphne Malatesta; and Kathy T-M Tam ITF Philemon Tam.

[15]Norton Decl., ¶ 6.

[16]$561,762.46 / 4 = $140,440.62.

[17]$742,638.17 / 6 = $123,773.03.

[18]$140,440.62 + $123,773.03 = $264,213.65.  The FDIC notes that some of the totals may be off by one cent due to rounding in the division of each account.  (FDIC's Brief at 7 n. 4).

1    Finally, he concluded that Kathy T-M Tam ITF Philemon Tam held a $140,440.62 interest
2    in the accounts.[19]

3    11.   Because each trust relationship was insured for $100,000, each of Philemon Tam ITF
4          Christine Tam; Philemon Tam ITF Victor Tam; and Philemon Tam ITF Daphne Malatesta
5          was $23,733.03 over the deposit insurance limit.  Kathy T-M Tam ITF Christine Tam;
6          Kathy T-M Tam ITF Victor Tam; and Kathy T-M Tam ITF Daphne Malatesta were each
7          $164,213.64 over the deposit insurance limit, while Kathy T-M Tam ITF Philemon Tam
8          was $40,440.62 over the deposit insurance limit.[20]

9    12.   Norton concluded that the Titus Tambunan's two accounts were held in trust for his niece
10         and nephew.  Because neither a niece nor a nephew is a qualifying beneficiary, Norton
11         treated these funds as if they had reverted to the single ownership of Tambunan.  As a
12         single owner, Tambunan was insured for $100,000.  Consequently, Tambunan's accounts
13         were $653,260.42 over the deposit insurance limit.[21]

14   13.   Howard calculated the total combined account balance for the five revocable trust accounts
15         as $2,057,661.05.   As the accounts were insured only to $800,000, they were
16         $1,257,661.05 over the deposit insurance limits.[22]

17   14.   On August 5, 2009, the FDIC sent plaintiffs a Notice of Allowance of Claim ("Notice")
18         and a Receivership Certificate in the amount of $1,257,661.05.[23]

19   15.   Based on the FDIC's calculation that the ultimate resolution of IndyMac's assets would
20         result in a recovery of approximately 50% of the uninsured deposits of IndyMac, FDIC

21
22
23
24         [19]Norton Decl., ¶ 6.

25         [20]*Id.*, ¶ 7.

26         [21]*Id.*, ¶ 7.

27         [22]*Id.*, ¶ 7.

28         [23]*Id.*, ¶ 8.  AR, Exh. D.

1    sent the Tams a 50% advance dividend in the amount of $628,830.53.[24]

2    16.    On September 23, 2009, the FDIC notified the court that it had reviewed the accounts held

3           by Tambunan and determined that Tambunan was entitled to an additional $100,000 in

4           insurance, bringing the total insurance for all of plaintiffs' accounts to $900,000.  The

5           supplemental briefing does not indicate the reasoning for this revision.[25]

6

7                           **II.  CONCLUSIONS OF LAW**

8           **A.      Standard of Review**

9    17.    The FDIC's determination of insurance coverage is governed by the Federal Deposit

10          Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

11   _____

12          [24]*Id.*, ¶ 9.

13          [25]Following the passage of the Dodd-Frank Wall Street Reform and Consumer Protection
14   Act ("the Dodd-Frank Act"), the court directed the FDIC to file a status report indicating, *inter
     alia*, the amount of any further insurance payment that had been made to plaintiffs under the
15   retroactive provisions of the act, the amount of plaintiffs' deposits that remained uninsured
     following the additional payment, and what further briefing was required to conclude the action.
16   Plaintiffs were advised that if they disputed the information set forth in the FDIC's status report,
17   they could file a response.  (Minute Order Directing the FDIC to Submit Status Reports, Docket
     No. 97, July 21, 2010).)
18          The FDIC's status report stated that plaintiffs had received additional deposit insurance of
19   $282,929.17 on July 26, 2010, and that following that payment, the uninsured balance in their
     accounts was $295,901.35.  The FDIC noted that this order had yet to be finalized, and that
20   plaintiffs had filed an *ex parte* application seeking leave to file a first amended complaint that
     remained pending.  (Status Report Pursuant to July 21, 2010 Order, Docket No. 98 (Aug. 2,
21   2010).)  Plaintiffs' only response to the FDIC's status report was a pleading that argued that the
22   court should not grant the motion to dismiss that is the subject of this order.  The response also
     contended that IndyMac employees had been negligent.  Plaintiffs did not take issue with the
23   FDIC's supplemental insurance determination under the Dodd-Frank Act.  (Reply Opposition to
24   Defendant's Status Report Pursuant to July 21, 2010 Order, Docket No. 99 (September 2, 2010).)
     The court had previously dismissed plaintiffs' negligence claim under 12 U.S.C. § 1821(d) with
25   prejudice.  (See Order Granting FDIC's Motion to Dismiss, Docket No. 92 (Jan. 27, 2010).)  The
     court denied plaintiffs' *ex parte* application for leave to file a first amended complaint on July 29,
26   2011 (see Order Denying *Ex Parte* Application, Docket No. 100 (July 29, 2011)) , and it has now
27   finalized this order.  Since plaintiffs raised no additional issues in their response to the FDIC's
     status report, the court concludes that it is appropriate to enter judgment in the FDIC's favor at
28   that time.

18. The FDIC's final determination "regarding any claim for insurance coverage [is] a final agency action reviewable in accordance with" the Administrative Procedure Act ("APA"). 12 U.S.C. § 1821(f)(4). Under the APA, the court examines whether the FDIC's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the parties agree that the relevant question the court must answer is whether the FDIC's action was arbitrary or capricious.[26]

19. Final agency decision is arbitrary and capricious if the agency "'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's Inc. v. U.S. Consumer Product Safety Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

20. A district court is limited to a review of the reasoning on which the agency relied in making its decision. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). It can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43. Where an agency offers an "interpretation of its own regulation [that] reflects its considered views," even if those views are developed in response to litigation and communicated in a legal brief, the court should accept the interpretation if convinced it is not "merely a *post hoc* rationalization." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007). See also *Alaska v. Federal Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43). "'Nevertheless, the agency must examine

---

[26]Tams' Brief at 3-4; FDIC's Brief at 3.

1    the relevant data and articulate a satisfactory explanation for its action including a rational

2    connection between the facts found and the choice made.'" *Northwest Coalition for*

3    *Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544

4    F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463

5    U.S. at 43).

6    21.   "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly

7    erroneous' or inconsistent with 'the regulations being interpreted.'" *Public Citizen v.*

8    *Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island*

9    *Care at Home*, 551 U.S. at 171).  See also *Long Island Care at Home*, 551 U.S. at 170-71

10   ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation

11   alone presents no separate ground for disregarding the Department's present

12   interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir.

13   2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies

14   and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)).  "In other

15   words, we must defer to the [agency's] interpretation unless an 'alternative reading is

16   compelled by the regulation's plain language or by other indications of the [agency's] intent

17   at the time of the regulation's promulgation.'" *Thomas Jefferson University v. Shalala*,

18   512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

19   See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126,

20   1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the

21   agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so

22   long as the interpretation sensibly conforms to the purpose and wording of the

23   regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499

24   U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries*

25   *Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations

26   it is charged with administering is entitled to a high degree of deference and will be upheld

27   as long as it is not plainly erroneous or inconsistent with the regulation").

28

**B.     Whether the FDIC Properly Determined the Amount of Deposit Insurance to Which Plaintiffs Were Entitled under the Regulations Applicable on August 9, 2008**

22.     The FDIC's deposit insurance determinations are governed the regulations set forth in 12 C.F.R. Part 330.   Regulations governing recognition of deposit ownership and fiduciary relationships note that, except in circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).[27]  See also *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is entitled to rely exclusively on the account records of the failed institution," and that "while ownership under state law is one prerequisite for insurance coverage, the deposit account records are controlling").   "Deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the

---

[27]The regulation continues:
"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned.   If the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned.   Despite the general requirements of this paragraph (a)(1), if the FDIC has reason to believe that the insured depository institution's deposit account records misrepresent the actual ownership of deposited funds and such misrepresentation would increase deposit insurance coverage, the FDIC may consider all available evidence and pay claims for insured deposits on the basis of the actual rather than the misrepresented ownership." 12 C.F.R. § 330.5(a)(1).

insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).[28]  As noted, plaintiffs did not seek leave to conduct further discovery, and do not object to the contents of the administrative record.

23.     At the time IndyMac closed, revocable trust accounts were insured up to $100,000 per owner if certain conditions were met.  First, the title of the account had to reflect that the funds were held pursuant to a formal revocable trust set up by an owner or grantor.  The owner or grantor was required to retain ownership during his or her life.  12 C.F.R. § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829-30 (Jan. 21, 2004) (stating that "revocable trust accounts held in connection with a formal revocable trust created by an owner/grantor and over which the owner/grantor retains ownership during his or her lifetime," qualify for coverage if "the title of the account . . . reflect[s] that the funds in the account are held pursuant to a formal revocable trust").  Second, while the beneficiaries need not be identified by name in the deposit account records, they must be "qualifying" beneficiaries.  The  "owner's  spouse,  child/children,  grandchild/grandchildren,  parent/parents, brother/brothers or sister/sisters" are "qualifying beneficiaries."  12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[29]

24.     When a revocable trust account was established by more than one owner and held for the benefit of others, some or all of whom were qualifying beneficiaries, the regulation provided that the respective interests of each owner held for the benefit of each qualifying beneficiary would be separately insured up to $100,000.  12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998).  The owners were presumed to have equal interests in the account unless otherwise stated in the deposit account records.  *Id.*

---

[28]The term excludes "account statements, deposit slips, items deposited or cancelled checks."  12 C.F.R. § 330.1(e).

[29]Under the regulations in effect when IndyMac closed and the FDIC made the insurance determination challenged in this action, there was "no requirement . . . that the deposit account[ ] records of the depository institution indicate the names of the beneficiaries of the living trust and their ownership interests in the trust."  12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830 (Jan. 21, 2004).

25.   While the trust owner was the insured party, insurance coverage was provided for the interest of each qualifying beneficiary up to $100,000.  12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004). If a named beneficiary of a revocable trust account was not a qualifying beneficiary, the funds held for the benefit of that beneficiary were treated as individually owned by the grantor.  12 C.F.R. § 330.10(c) (2008), 63 Fed. Reg. 25760 (May 11, 1998).

26.   Stated differently, the FDIC insured each grantor up to $100,000 for the interest of each qualifying beneficiary.  If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured.  12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998); Advisory Opinion FDIC-05-05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1-2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume . . . that the two grantors . . . have contributed equal amounts. . . .  The amount contributed by each grantor for each 'qualifying beneficiary' would be insured separately").  In making its insurance determination, therefore, the FDIC assumes that, unless otherwise stated, each grantor has contributed 50% of the funds in the account.  Advisory Opinion FDIC-05-05, 2005 WL 2979649 at *2 ("[Where B and C are two grantors], with an account balance of $550,000, the FDIC would assume that B has contributed $275,000 and that C has contributed $275,000. The funds contributed by B would be insured separately from the funds contributed by C").  It then analyzes insurance coverage as if the revocable trust account were two accounts, each holding 50% of the funds, and there were separate trustee-beneficiary relationships between each grantor and each beneficiary.  *Id.* at *2-4.  As a result, in a situation where there are two grantors and a single qualifying beneficiary, insurance coverage of $200,000 is available.  *Id.* (describing a hypothetical in which a daughter is a qualifying beneficiary of both grantors, and each grantor is therefore insured to $100,000).  Conversely, where a person is a qualifying beneficiary of one grantor, but

1    a non-qualifying beneficiary of the second, only the qualifying relationship is insured.[30]

2  27.    In this case, with respect to accounts XXXXXX7347 and XXXXXX0218, there are seven

3    beneficial relationships.   Of the seven beneficial relationships, all were qualifying

4    relationships.[31]   There were no non-qualifying relationships.   Consequently, each

5    qualifying relationship was insured up to $100,000 for a total of $700,000.

6  28.    The funds held by Tambunan for the benefit of non-qualifying beneficiaries were treated

7    as owned by Tambunan.  The FDIC thus determined that Tambunan was entitled to receive

8    $100,000 in insurance coverage.

9  29.    The FDIC's final deposit determination regarding plaintiffs' accounts was in accordance

10    with the law and supported by the evidence upon which FDIC was required to rely.

11    Although plaintiffs dispute whether the regulation in effect at the time the deposit insurance

12    determination was made applies, and also contend that the regulation was too vague and

13    complex to understand or apply, they do not dispute that the FDIC correctly applied the

14    regulation to their accounts.[32]

15    **C.    Whether the Prior Regulation Was Arbitrary or Capricious**

16  30.    Plaintiffs do not explicitly challenge the prior regulation's validity.  Rather, they assert that

17    it was "too ambiguous and complex for the public to understand," and that it was so

18    "flawed" that the FDIC took the unusual step of implementing an interim rule before the

19    notice and comment period.[33]  Despite plaintiffs' criticisms, the court concludes that the

20    regulation was not an arbitrary or capricious interpretation of the governing statute.

21

22    [30]While this advisory opinion does not appear in the Federal Register, it does represent an

23  authoritative opinion of the FDIC regarding the interpretation of its own rules.  *Public Citizen*,

    573 F.3d at 923 (quoting *Long Island Care at Home*, 551 U.S. at 171) ("[A]n agency's

24  interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with

25  'the regulations being interpreted'").

26    [31]Norton Decl., ¶ 6.

27    [32]Tams' Reply at 3-4.

28    [33]*Id.* at 2-3.

31. Courts give broad deference to an agency interpretation so long as it meets the test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, if the court determines that "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009). "Second, if a statute is silent or ambiguous with respect to the issue at hand, we must defer to the agency so long as the agency's answer is based on a permissible construction of the statute.'" *Satterfield*, 569 F.3d at 952 (quoting *Chevron*, 467 U.S. at 843). "An agency's interpretation is permissible, unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 844).

32. While *Chevron* concerned formal notice-and-comment rulemaking by an agency, the Supreme Court clarified in *United States v. Mead Corp.*, 533 U.S. 218 (2001), that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1060 (9th Cir. 2003) (quoting *Mead*, 533 U.S. at 226-27). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead,* 533 U.S. at 227. "Those administrative decisions not meeting these standards may still be given deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 [ ] (1944)." *Satterfield*, 569 F.3d at 952-53.

33. Applying this test, "[t]he first step under the *Chevron* analysis is to determine 'whether Congress has directly spoken to the precise question at issue.'" *Satterfield*, 569 F.3d at 953 (quoting *Chevron*, 467 U.S. at 842). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n. 9. "It is well

1   settled that the starting point for interpreting a statute is the language of the statute itself.*

2   *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 56 (1987)

3   (internal citation and quotation marks omitted).   "[U]nless otherwise defined, words will

4   be interpreted as taking their ordinary, contemporary, common meaning.*   *Perrin v.*

5   *United States*, 444 U.S. 37, 42 (1979).

6   34.   Congress has delegated to the FDIC the authority to make rules and regulations to

7   implement the FDIA.  See 12 U.S.C. § 1821(d)(1).  Section 1821(a) provides that deposits

8   maintained by a depositor in the same capacity and the same right at an insured depository

9   institution must be aggregated and insured up to the standard maximum deposit insurance

10   amount ("SMDIA").  The Act does not define "depositor," "capacity," or "right."  See

11   63 Fed. Reg. 25750 (May 11, 1998).   Although § 1817(i)(1) provides a special rule for

12   insurance of *ir*revocable trust accounts, no section of the act specifically addresses

13   insurance of revocable trust accounts.   Section 1821(a)(1)(C) requires that the FDIC

14   "aggregate the amounts of all deposits in the insured depository institution which are

15   maintained by a depositor in the same capacity and the same right for the benefit of the

16   depositor either in the name of the depositor or in the name of any other person."   The

17   statute does not provide any further definition or guidance regarding the insurance to be

18   provided for revocable trust accounts that have multiple grantors and beneficiaries such as

19   the ones at issue here.

20   35.   Although Congress has mandated that FDIC promulgate rules governing the insurance of

21   deposit accounts, it has not spoken clearly on the insurance to be provided for revocable

22   trust accounts.  Indeed, it appears that the relevant statutory provisions were enacted before

23   revocable trust accounts became popular in the late 1980s and early 1990s.  See 69 Fed.

24   Reg. 2825 (Jan. 21, 2004).  Thus, "Congress could not have spoken clearly to this issue

25   . . . when the statute was enacted."  *Satterfield*, 569 F.3d at 954.  For all of these reasons,

26   the court concludes that the statute is silent as to the rules governing insurance of revocable

27   trust accounts.

28   36.   "'When a statute is ambiguous or leaves key terms undefined, a court must defer to the

15

1   federal agency's interpretation of the statute, so long as such interpretation is reasonable.'"

2   *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056 (9th Cir. 2008) (citing *Metrophones*

3   *Telecommunications, Inc. v. Global Crossing Telecommunications, Inc.*, 423 F.3d 1056,

4   1067 (9th Cir. 2005)).  Because the FDIA "is silent to the issue at hand, we must defer to

5   the agency so long as the agency's interpretation 'is based on a permissible construction

6   of the statute.'" *Satterfield*, 569 F.3d at 954 (quoting *Chevron*, 467 U.S. at 843).  The

7   FDIC's interpretation is permissible unless "arbitrary, capricious, or manifestly contrary

8   to the statute."  *Chevron*, 467 U.S. at 844.

9   37.   The FDIC promulgated a regulation providing that a revocable trust account "shall be

10   insured up to $100,000 for the prospective interest of each of the owner's designated

11   beneficiaries."  63 Fed. Reg. 25752 (May 11, 1998).  See also 64 Fed. Reg.15654 (Apr.

12   1, 1999) ("[T]he $100,000 insurance limit is not applied on a 'per owner' basis.  Rather,

13   the $100,000 insurance limit is applied on a 'per beneficiary' basis to all [ ] accounts

14   owned by the same person at the same insured depository institution.  For instance, a

15   [revocable trust] account owned by one person would be insured up to $500,000 if the

16   account names five qualifying beneficiaries").  The "per beneficiary" insurance was

17   available only for "qualifying beneficiaries."  Originally, these were spouses, children, and

18   grandchildren.  In 1999, however, the FDIC added siblings and parents as qualifying

19   beneficiaries.  *Id.*[34]

20   38.   Where a revocable trust account is established by more than one depositor, and held for

21   the benefit of others, some or all of whom are qualifying beneficiaries, "the respective

22   interests of each owner (which shall be deemed equal unless otherwise stated in the insured

23   depository institution's deposit account records) held for the benefit of each qualifying

24   beneficiary [are] separately insured up to $100,000."  63 Fed. Reg. 25761 (May 11,

25   1998).  In other words, "[t]he amount contributed by each grantor for each 'qualifying

26

27   _____

28   [34]It appears the definition of a qualifying beneficiary and the provision of "per beneficiary"
insurance dates back at least to 1967. 32 Fed. Reg. 10408 (July 14, 1967).

1    beneficiary' [is] insured separately."  Advisory Opinion FDIC-05-05 at *1.

2    39.   When a beneficiary of an account is not a qualifying beneficiary, the funds held for that

3          beneficiary are treated as individually owned by each of the grantors, and are aggregated

4          with other accounts owned by the grantors at the institution.  Each grantor is insured for

5          all accounts he or she owns up to $100,000.  63 Fed. Reg. 25760 (May 11, 1998).

6    40.   The FDIC recognized that "the rules governing the insurance of [revocable] trust accounts

7          are complex and confusing."  69 Fed. Reg. 2826 (Jan. 21, 2004).  "Consequently, in

8          response to questions about coverage of [revocable] trust accounts, the FDIC . . . advise[d]

9          depositors and bankers that they should assume that such accounts will be insured for no

10         more than $100,000 per grantor, assuming the grantor has no single-ownership funds in

11         the same depository institution. Otherwise, the FDIC suggest[ed] that the owners of living

12         trust accounts seek advice from the attorney who prepared the trust document.  Depositors

13         who contact[ed] the FDIC about their living trust insurance coverage [were] often troubled

14         to learn that they [could not] definitively determine the amount of their coverage without

15         a legal analysis of their trust document."  *Id.*  To ameliorate this confusion, in 2005 the

16         FDIC issued an advisory opinion that explained in detail how a revocable trust with two

17         grantors and multiple qualifying and non-qualifying beneficiaries would be treated.

18         Advisory Opinion FDIC-05-05.  While application of the regulation is complex, plaintiffs

19         cite no authority for the proposition that complexity alone compels a finding that a

20         regulation is an arbitrary or capricious interpretation of the governing statute.  Moreover,

21         the FDIC has endeavored to prevent unfair surprise by recommending that depositors seek

22         legal advice and assume that beneficiaries are not insured, 69 Fed. Reg. 2826 (Jan. 21,

23         2004), and by providing a detailed explanation of the insurance treatment of revocable trust

24         accounts with accompanying examples, Advisory Opinion FDIC-05-05.

25    41.   The FDIC's regulation is consistent with the purpose of the statute – to insure the deposits

26         of all insured depository institutions, 12 U.S.C. § 1821(a)(1)(A), while simultaneously

27         setting limits on such insurance by establishing a maximum deposit insurance amount, 12

28         U.S.C. § 1821(a)(1)(B), and requiring the aggregation of deposits maintained by a

depositor at a single institution, 12 U.S.C. § 1821(a)(1)(C). There is no evidence that the FDIC's interpretation was "arbitrary, capricious, or manifestly contrary to the statute." Consequently, the court concludes it is entitled to deference.

### D.   The New Regulation

42.   On September 30, 2008, the FDIC promulgated a new interim rule that eliminated the concept of qualifying beneficiaries. It noted that "depositors, consumer groups and bankers have questioned the fairness of limiting the coverage on revocable trust accounts to the naming of certain beneficiaries," 73 Fed. Reg. 56708 (Sept. 30, 2008), and that eliminating the concept of qualifying beneficiaries would make "the coverage rules easier to understand. Depositors and bankers no longer need to know who is a qualifying beneficiary and who is not. . . . Thus, under the interim rule, the FDIC anticipates being able to make quicker deposit insurance determinations on revocable trust accounts at institution failures." *Id.*

43.   Under the interim rule, a revocable trust account with an aggregate balance exceeding $500,000 and naming more than five beneficiaries is insured for the greater of $500,000, or the "aggregate amount of the ownership interests of each different beneficiary named in the trusts." 12 C.F.R. § 330.10(e) (interim rule), 73 Fed. Reg. 56711 (Sept. 30, 2008). Because plaintiffs' trust had eight beneficiaries, it would be entitled to insurance of $800,000, an amount exceeding the actual deposits.

44.   The interim rule is "effective as of September 26, 2008 for all existing and future revocable trust accounts." 12 C.F.R. § 330.10(i) (interim rule), 73 Fed. Reg. 56712 (Sept. 30, 2008). See also 73 Fed. Reg. 56710 (Sept. 30, 2008) ("The interim rule is effective on September 26, 2008, the date on which the FDIC Board of Directors approved the interim rule").

### E.   Whether Plaintiffs' Account Was "Existing" on September 26, 2008

45.   Plaintiffs argue that "there is no legitimate dispute that Plaintiffs' accounts existed when

1     the revised regulation was adopted."[35]

2   46.   In a related case – *Henry et al. v. FDIC*, Case Nol. CV 08-05631MMM (AJWx), the court

3         requested that the parties submit supplemental briefs addressing whether the trust accounts

4         were "existing" as of September 26, 2008.[36]  The FDIC contends that the trust accounts

5         at IndyMac Federal Bank are not the same accounts that plaintiffs held at IndyMac.[37]  It

6         asserts that deposit accounts are insured only through a particular insured depository

7         institution, and that, when an account is transferred to a new bank, it is not considered the

8         same account.  See 12 U.S.C. § 1821(a)(1)(A) ("The [FDIC] shall insure the deposits of

9         all insured depository institutions as provided in this chapter").

10  47.   The FDIC asserts that it implements the statutory requirement that insurance determinations

11        and payments occur "as soon as possible," 12 U.S.C. § 1821(f)(1), by fixing a depositor's

12        rights "as of the day of failure," 73 Fed. Reg. 2364 (Jan. 14, 2008).  The rule the FDIC

13        cites, although proposed prior to IndyMac's closure, was not adopted until six days after

14        IndyMac's failure.  73 Fed. Reg. 41170 (July 17, 2008).  The FDIC thus concedes, as it

15        must, that the rule was not in effect as of July 11, 2008.  It contends, however, that the

16        rule embodies "the FDIC's long-standing practice of determining a depositor's insurance

17        as of the date of closure."[38]  Moreover, although not final as of September 26, 2008, the

18        rule was drafted prior to that date, and provides some insight regarding the agency's intent

19        with respect to the treatment of existing accounts.

20  48.   The FDIC also cites *Lambert v. Federal Deposit Insurance Corp.*, 847 F.2d 604 (9th Cir.

21        1988), in support of its position.  Although not directly on point, *Lambert* describes the

22

23        [35]Tam's Brief at 5.

24

25        [36]At that time, the Tams were represented by the same attorney as the Henrys.

26        [37]Defendant Federal Deposit Insurance Corporation's Supplemental Trial Brief ("FDIC's

27        Supp. Brief"), *Henry et al. v. FDIC*, Case No. CV 08-05631 MMM (AJWx), Docket No. 31
          (Sept. 22, 2009) at 2.

28        [38]*Id.* at 4 n. 2.

date on which a bank closes as the "critical date" for purposes of the FDIC's insurance determination. *Lambert* examined whether a trust was revocable or irrevocable, a question which turned on which the "surviving trustor" had died as of the date of the insurance determination. *Id.* at 607. *Lambert*, therefore, addressed the critical date for purposes of factual determinations relevant to the amount of insurance available. Here, the issue is somewhat different, i.e., what date is critical for purposes of determining the applicable *law*. The remaining cases cited by the FDIC similarly concern factual determinations rather than the applicability of a change in the law. *Villafane-Neriz*, 75 F.3d at 730 (holding that the FDIC may rely on erroneous bank records to determine whether there was an insured deposit "at the time of [the bank's] failure"); *Federal Deposit Insurance Corp. v. Liberty National Bank & Trust Co.*, 806 F.2d 961, 964-65 (10th Cir. 1986) (holding that "no additional rights can be created after insolvency," but that beneficiary's claims under standby letters of credit were provable against the FDIC as receiver despite the fact that the beneficiaries made their demand after the bank's insolvency because the claims were fixed as of the date of insolvency); *Federal Deposit Insurance Corp. v. McKnight*, 769 F.2d 658, 661 (10th Cir. 1985) (reviewing whether the FDIC had mistakenly paid funds on a cashier's check, and holding that a bank's closure "not only triggered the liquidation process, but it also cast in stone the relationship of defendants to the bank"); *American National Bank of Jacksonville v. Federal Deposit Insurance Corp.*, 710 F.2d 1528, 1540 (11th Cir. 1983) (holding that a plaintiff cannot rely on factual events that take place subsequent to a bank's closure to support its claimed ownership of escrow funds). Plaintiffs' case authority similarly addresses the critical date for factual determinations relevant to the insurance determination.

49.   The FDIC also argues that its interpretation of the regulation is entitled to deference. "When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.'" *Oregon Paralyzed Veterans of America*, 339 F.3d at 1131 (quoting *Martin*, 499 U.S. at 150-51). See also

*Wards Cove*, 307 F.3d at 1218 ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation").  The court concludes that the FDIC's interpretation of the meaning of existing account as tied to a particular depository institution is reasonable, particularly in light of the statutory mandate that the FDIC insure the "deposits *of all depository institutions*."  12 U.S.C. § 1821(a)(1)(A) (emphasis added).  The court is mindful that the FDIC articulated this rationale only in a legal brief at a late stage of this litigation.  Because plaintiffs adduce no evidence that the term "existing account" has been applied inconsistently in other cases, because the interpretation is consistent with the FDIC's practice of determining insurance coverage as of the date of a bank's closure, and because the interpretation is a reasonable construction of the interim rule, the court affords the FDIC's interpretation deference and finds that plaintiffs' trust accounts at IndyMac were not "existing" on September 26, 2008, as that term is used in the interim rule.  See *Long Island Care at Home*, 551 U.S. at 171 (where an agency's "interpretation of its own regulation reflects its considered views," even if those views were developed in response to litigation and set forth in a legal brief, the court should accept its interpretation so long as it is not "merely a *post hoc* rationalization").

**F.    Whether the Court Must Apply the Interim Rule Under *Bradley***

50.    That the FDIC correctly applied the old regulation does not end the inquiry, however.  Plaintiffs argue that, notwithstanding the FDIC's regulatory interpretation, the rule in *Bradley v. School Board of City of Richmond*, 416 U.S. 696 (1974), mandates that "a court . . . apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."  *Id.* at 711.  See also *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281 (1969) ("[A]n appellate court must apply the law in effect at the time it renders the decision");  *DeGurules v. I.N.S.*, 833 F.2d 861, 863 (9th Cir. 1987) ("[I]n great national concerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law,

the judgment must be set aside," quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) (omission original)). *Bradley* emphasized that "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715.[39]

51. Retroactive application of a rule is disfavored. *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208-09 (1988) ("Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"). "Fairness concerns dictate that courts must not lightly disrupt settled expectations or alter the legal consequences of past actions." *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 835 (9th Cir. 1997). The Supreme Court in *Bowen* did not cite *Bradley* and hence created an "'apparent tension' between 'the rule articulated in *Bradley*' and the 'generally accepted axiom' reaffirmed in *Bowen*." *Gersman v. Group Health Association, Inc.*, 975

---

[39]Following oral argument, plaintiffs filed a notice of supplemental authorities, citing four cases in which the FDIC had taken the position that *Bradley* applied rather than *Bowen*. (Plaintiffs Philemon Tam, Kathy T-M Tam, Titus Tambunan, Christine Tam, and Victor Tam's Supplemental Authorities, Docket No. 68 (Oct. 20, 2009) (citing *F.D.I.C. v. Faulkner*, 991 F.2d 262, 265-66 (5th Cir. 1993) (" FDIC Receiver contends that we should apply the apparently conflicting rule set down in *Bradley*"); *Federal Deposit Insurance Corp. v. Yemelos*, 778 F.Supp. 329, 331 (E.D. La. 1991) ("The FDIC argues that under *Bradley*[ ], laws are to be applied retroactively unless there is a clear Congressional intent to the contrary or if 'manifest injustice' would result"); *Federal Deposit Insurance Corp. v. Sullivan*, 744 F.Supp. 239, 241 (D. Colo. 1990) ("The FDIC, also citing *Bradley*, urges that FIRREA's amendment to § 1823(e) be applied retroactively"); *Federal Deposit Insurance Corp. v. Dalba*, No. 89-C-712-S, 1990 WL 43750, *3 (W.D. Wis. Feb. 27, 1990) ("[FDIC] asserts that the Court must always apply current law to actions pending before it").) The FDIC responded with a detailed memorandum distinguishing each case from the present one. (Defendant Federal Deposit Insurance Corporation's Response to Plaintiffs' Supplemental Authorities, Docket No. 69 (Oct. 29, 2009).) Specifically, *Faulkner* involved a request for injunctive relief, and thus fit within *Landgraf*'s exception for prospective relief. *Faulkner*, 991 F.2d at 267. In *Yemelos*, the court found  clear congressional intent that the Comprehensive Crime Control Act of 1990 be applied retroactively. *Yemelos*, 778 F.Supp. at 332. While the holdings in *Dalba* and *Sullivan*, where the courts retroactively applied a legal defense under 12 U.S.C. § 1823(e) may at first blush appear in consistent with the FDIC's position in this action, they prove only that prior to the Supreme Court's decision in *Landgraf*, courts and the FDIC struggled to harmonize *Bradley* and *Bowen*. Plaintiffs' supplemental authorities do not demonstrate that the FDIC has ever taken a position inconsistent with that it advances here regarding the proper interpretation of *Landgraf*.

1    F.2d 886, 894-95 (D.C. Cir. 1992) (quoting *Kaiser Aluminum & Chemical Corp*. *v.*

2    *Bonjorno*, 494 U.S. 827, 837 (1990)).[40]

3    52.    The Supreme Court reconciled *Bradley* and *Bowen* in *Landgraf v. USI Film Products*, 511

4    U.S. 244 (1994).   The *Landgraf* Court affirmed the rule in *Bowen* that "congressional

5    enactments and administrative rules will not be construed to have retroactive effect unless

6    their language requires this result."   *Id*. at 272 (quoting *Bowen*, 488 U.S. at 208).   The

7    Court noted, however, the difficulty in determining whether a statute or rule is retroactive.

8    It observed that it was necessary to "ask whether the new provision attaches new legal

9    consequences to events completed before its enactment.   The conclusion that a particular

10    rule operates 'retroactively' comes at the end of a process of judgment concerning the

11    nature and extent of the change in the law and the degree of connection between the

12    operation of the new rule and a relevant past event."   *Id*. at 269-70.[41]

13    53.    Affirming *Bowen*'s presumption against retroactivity, the Court interpreted *Bradley* as an

14    exception to the general rule.   The congressional enactment applied in *Bradley* was a

15    provision governing awards of attorneys' fees in civil rights cases.   Prior to its passage,

16    federal courts were permitted to award fees based on equitable principles, as the district

17    court in *Bradley* had done.   "In light of the prior availability of a fee award, and the

18    _____

19    [40]In *Kaiser*, the Supreme Court expressly declined to reconcile the two lines of precedent

20    because it concluded that Congress clearly intended that a statutory amendment was to apply
prospectively only.   *Kaiser*, 494 U.S. at 837.   Justice Scalia, concurring in the result, wrote

21    separately to state that the *Bradley* and *Bowen* were not merely in apparent tension, but in

22    "irreconcilable contradiction."   *Id*. at 841 (Scalia, J., concurring).   He reviewed the *Thorpe* and
*Bradley* cases and determined that they had misinterpreted and misapplied Supreme Court

23    precedent, including Chief Justice Marshall's opinion in *Schooner Peggy*.   Justice Scalia noted that
*Schooner Peggy* stood only for the proposition that when Congress "plainly says" legislation has

24    retroactive effect, the courts may depart from "the ordinary presumption which courts will
'struggle hard' to apply" against retroactivity.   *Id*. at 846-47.

25

26    [41]The Court explicitly noted that this test would "leave room for disagreement in hard
cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical

27    clarity."   *Landgraf*, 511 U.S. at 270.   Nonetheless, it observed that "retroactivity is a matter on
which judges tend to have 'sound . . . instinct[s].'"   *Id*. (quoting *Danforth v. Groton Water Co.*,

28    178 Mass. 472, 476 (1901) (Holmes, J.)).

likelihood that fees would be assessed under pre-existing theories, [the Court] concluded that the new fee statute simply 'd[id] not impose an additional or unforeseeable obligation' on the school board." *Landgraf*, 511 U.S. at 278 (quoting *Bradley*, 416 U.S. at 721).

54.  In *Landgraf*, the Supreme Court identified three exceptions to the presumption against retroactivity. It first cited *Thorpe*, which held that a new agency policy requiring a local housing authority to give notice and an opportunity to respond before evicting a tenant applied to an eviction proceeding commenced before it was enacted. *Thorpe*, 393 U.S. 268 at 279. The *Landgraf* Court characterized *Thorpe* as a case in which the "new hearing procedures did not affect either party's obligations," and held that "procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Landgraf*, 511 U.S. at 275-76.

55.  In addition to procedural rules, the Court also concluded cases seeking "prospective-relief" were not subject to the presumption against retroactivity. "When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 273. The Court cited *American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184 (1921), as an example of this principle. *Id.* There, the Court held that a section of the Clayton Act, enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing. *Id.* at 201; *Landgraf*, 511 U.S. at 273. "[B]ecause relief by injunction operates *in futuro* and the right to it must be determined as of the time of the hearing, [the amendment] relating to injunctions was controlling in so far that decrees entered after its passage should conform to its provisions." *American Steel Foundries*, 257 U.S. at 201.

56.  Finally, the Court created an exception for statutes "conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Landgraf*, 511 U.S. at 274 (citing *Bruner v. United States*, 343 U.S. 112, 116-17 (1952)). The Court concluded such an exception was appropriate because "[a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Id.* (quoting *Hallowell v. Commons*, 239 U.S. 506, 508

1   (1916)).

2   57.   The *Landgraf* Court summarized its holding as follows:

3           "When a case implicates a federal statute enacted after the events in

4           suit, the court's first task is to determine whether Congress has

5           expressly prescribed the statute's proper reach. If Congress has done

6           so, of course, there is no need to resort to judicial default rules.

7           When, however, the statute contains no such express command, the

8           court must determine whether the new statute would have retroactive

9           effect, i.e., whether it would impair rights a party possessed when he

10          acted, increase a party's liability for past conduct, or impose new

11          duties with respect to transactions already completed. If the statute

12          would operate retroactively, our traditional presumption teaches that

13          it does not govern absent clear congressional intent favoring such a

14          result." *Id.* at 280.

15  58.   The Ninth Circuit applied *Landgraf* to administrative regulations in *Covey*. *Covey*

16  concerned the applicability of Department of Housing and Urban Development ("HUD")

17  regulations that defined "housing for older persons" that was exempt from the Fair

18  Housing Act's prohibition on familial status discrimination. *Covey*, 116 F.3d at 832-33.

19  Under a rule promulgated in 1988, the exemption applied if a party adduced evidence of

20  "the existence of significant facilities and services specifically designed to meet the

21  physical or social needs of older persons." *Id.* at 832. Because "significant facilities and

22  services" proved difficult to interpret and implement, HUD promulgated more specific

23  guidelines in 1995. *Id.* at 833. Shortly after their implementation, a district court applied

24  the 1995 regulations and granted summary judgment for defendants in a case that had been

25  filed in 1993. *Id.* at 834. Plaintiffs did not seek prospective relief and all the events at

26  issue had occurred prior to the effective date of the 1995 HUD regulations. *Id.* at 835.

27  59.   The Ninth Circuit held that "applying the 1995 regulations retroactively simply because

28  [plaintiffs'] claim ha[d] not yet been reduced to a judicial determination of liability would

25

gravely undermine the presumption against retroactivity." *Id.* at 837. Citing *Bradley*, defendants argued that the new regulations simply clarified HUD's prior definition of the "significant facilities and services" requirement. *Id.* The Ninth Circuit concluded, to the contrary, that the new regulations "substantially alter[ed] the standard" for determining whether a facility could gain an exemption and declined to apply it to the dispute at hand. *Id.*[42]

60.   Applying *Landgraf* and its Ninth Circuit progeny to the interim rule at issue in this case, the court must "first determine whether the [FDIC] expressly stated its intent to apply the new [rule] retroactively or prospectively." *TwoRivers v. Lewis*, 174 F.3d 987, 993 (9th Cir. 1999) (citing *Landgraf*, 511 U.S. at 280). The court has concluded, as a matter of deference to the administrative agency that promulgated the regulation, that the FDIC did not expressly state its intent to apply the statute to accounts held at depository institutions that closed prior to September 26, 2008.

61.   Given that there is no "clear language directing that [the court] apply the new statute retroactively, the court next [examines] whether the new statute would have retroactive effect." *Id.* (citing *Landgraf*, 511 U.S. at 280). *Landgraf* identifies three factors that inform the court's decision in this regard: whether the regulation "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Covey*, 116 F.3d at 835 (quoting *Landgraf*, 511 U.S. at 280). See also *Landgraf*, 511 U.S. at 269 ("'[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective,'" quoting *Society for*

---

[42]The Ninth Circuit reached the same conclusion in *In re NOS Communications*, 495 F.3d 1052 (9th Cir. 2007). There, plaintiffs had not been billed by defendant after Truth-in-Billing regulations were promulgated. The court concluded that they could not assert claims under the regulations, stating: "Nothing in the language indicates a clear congressional intent favoring retroactivity. In addition, the regulation imposes new duties with respect to transactions already completed." *Id.* at 1062.

*Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (C.C.N.H. 1814) (Story, J.)); *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 947 (1997) (describing each factor outlined in *Landgraf* and *Wheeler* as "a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity" (emphasis original)).

62.   Application of the new regulation to this case would unquestionably have retroactive effect. It would increase the FDIC's liability for past conduct, as the FDIC would be required to make a higher insurance payment based on a July 11, 2008 bank failure due to regulations promulgated on September 26, 2008.  Because it "attaches a new disability," namely, a significantly increased level of insurance "in respect to transactions or considerations already past [it] must be deemed retrospective."   *Wheeler*, 22 F. Cas. 767.  See also *Covey*, 116 F.3d at 835 ("Cases involving settled contract and property rights, for example, require predictability and stability and are generally inappropriate candidates for retroactivity").[43]

63.   "[I]f the court determines that the [regulation] operates retroactively, the traditional presumption in favor of prospectivity precludes application of the new [regulation] 'absent clear congressional [or regulatory] intent favoring such a result.'"  *TwoRivers*, 174 F.3d at 993 (quoting *Landgraf*, 511 U.S. at 280).  As in *Covey*, the court finds that the new regulations "substantially alter the standard" for determining the insurance coverage or revocable trust accounts.  *Covey*, 116 F.3d at 837.  Applying the new regulation simply

---

[43]At oral argument, plaintiffs cited the *DeGurules* factors that govern whether retroactive application will cause manifest injustice.  *DeGurules*, 833 F.2d at 863 ("Whether a retroactive application will cause manifest injustice is . . . turn determined by an assessment of three factors: (1) the nature and identity of the parties; (2) the nature of their rights; and (3) the nature of the impact of the change in law upon those rights").   The *DeGurules* court held that "[t]he fact that the party adversely affected by the new law is a governmental entity makes a finding of manifest injustice less likely."  *Id.* (quoting *Campbell v. United States*, 809 F.2d 563, 575 (9th Cir. 1987)). Without deciding the continued vitality of *DeGurules* in light of the Supreme Court's later ruling in *Landgraf*, the court need not address whether retroactive application would cause manifest injustice, because the court has already found that the regulation does not have retroactive application.

because plaintiffs' claim "has not yet been reduced to a judicial determination . . . would gravely undermine the presumption against retroactivity," particularly given the lack of a clear regulatory intent to the contrary.[44]

### III. CONCLUSION

For the reasons stated, the court finds that plaintiffs are not entitled to recover further insurance for their revocable trust accounts from the FDIC.

DATED: November 14, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[44]At oral argument, plaintiffs argued that three policies articulated in *Landgraf* militate in favor of applying the new regulation retroactively. First, plaintiffs cited *Landgraf*'s invocation of elementary considerations of fairness. *Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted"). The Supreme Court concluded, however, that considerations of fairness justify a presumption *against* retroactivity, and not, as plaintiffs suggest, that they favor retroactive application. See also *Hernandez de Anderson v. Gonzales*, 497 F.3d 927, 935 (9th Cir. 2007) (noting that *Landgraf*'s invocation of "elementary considerations of fairness" justified a finding that "the legal effect of conduct should ordinarily be assessed under the law that existed when the *conduct* took place," and not according to the law that exists at the time the court reviews the conduct, quoting *Landgraf*, 511 U.S. at 264-65); *Koch v. S.E.C.*, 177 F.3d 784, 785 (9th Cir. 1999) ("elementary considerations of fairness" require a "clear statement" that legislation is to be applied retroactively). Second, plaintiffs contended that there are many situations in which it is proper to apply new statutes or regulations enacted after the events that give rise to the cause of action. As discussed, *Landgraf* found retroactive application proper in three situations, none of which describes the circumstances in which plaintiffs find themselves. Finally, plaintiffs asserted that retroactivity provisions "often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Landgraf*, 511 U.S. at 267-68. This is unquestionably true. Nonetheless, the next sentence of the *Landgraf* opinion states: "However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268. Because the court concludes that the FDIC did not indicate an intention that the new regulation apply retroactively, this policy does not aid plaintiffs here.